UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-61607-CIV-COHN/SELTZER


DONALD SPADARO, as limited guardian
for ANTHONY CARAVELLA.

        Plaintiff,

v.

CITY OF MIRAMAR, a municipality;
GEORGE H. PIERSON, JR., WILLIAM
MANTESTA, and WILLIAM FREDERICK
GUESS, individually and in their official
capacities as former police officers for the
CITY OF MIRAMAR; AL LAMBERTI,
in his official capacity as the Sheriff of Broward
County; KENNETH C. JENNE, II, individually
and in his official capacity as the former Sheriff
of Broward County; ANTHONY FANTIGRASSI,
individually and in his official capacity as a former
deputy sheriff for the Broward County Sheriff's Office.

        Defendants.

_____/


## RETENTION AS POLICE PROCEDURES EXPERT

My name is Melvin L. Tucker and I was retained by counsel for the plaintiff in this case to review the investigation into the November 5, 1983 murder of Ada Cox Jankowski conducted by Miramar, Florida Police Department Detectives William Guess, George Pierson and William Mantesta, with assistance from Broward County, Florida Sheriff's Office Deputy Anthony Fantigrassi. Their investigation resulted in the wrongful conviction of Anthony Caravella and his incarceration for twenty-six years for a crime he did not commit. I was asked to render my opinions as to (1) whether the Miramar and Broward County detectives followed the legal and professional standards recognized in the law enforcement profession in 1983 when they conducted the murder investigation; (2) whether there was a pattern and practice in the Miramar Police Department and Broward County Sheriff's Office in 1983 and subsequent years of violating the legal rights of persons being

1

investigated; knowingly obtaining false confessions; and conducting biased and incomplete investigations; and (3) whether there was a pattern and practice of ignoring officer misconduct in the Miramar Police Department and Broward County Sheriff's Office.

## GENERAL QUALIFICATIONS

I retired as the Chief of Police for the City of Tallahassee, Florida in 1994. During a twenty-five year law enforcement career, I served as a Chief of Police in four cities, in three states and as an Agent for the Federal Bureau of Investigation.

I served as an FBI Agent from 1969 to 1971 and as the Chief of Police in Morristown, Tennessee; Hickory, North Carolina; Asheville, North Carolina and Tallahassee, Florida during the time period from 1971 to 1994.

I served as an adjunct faculty member in criminal justice at Western Carolina University located in Cullowhee, NC; Florida State University, Florida A&M University, and Tallahassee Community College located in Tallahassee, FL; Walters State Community College located in Morristown, TN; and the University of Maine located in Augusta, ME.

I have held several law enforcement certificates, including the Advanced Certificate from the State of North Carolina and Basic Certificates from Tennessee and Florida. I am currently certified by the National Institute of Ethics (NIE) as a Law Enforcement Ethics Instructor.

I received my bachelor's degree from the University of South Florida, Tampa, Florida and my master's degree, with honors, from Appalachian State University, Boone, North Carolina.

## SPECIFIC QUALIFICATIONS TO PROVIDE OPINIONS ON THE FACTS OF THIS CASE

I have personally conducted numerous criminal investigations and conducted interviews of witnesses and interrogations of criminal suspects including suspects in homicide cases.

I supervised criminal investigation divisions in four municipal police agencies during my twenty-five year law enforcement career and reviewed hundreds of interrogations and confessions of suspects to insure they were freely and voluntarily given and gave no indication of being a false confession.

I wrote criminal investigation and interrogation policies for four municipal police agencies and insured the officers working in the criminal investigations division were aware of and complied with those policies.

I taught a criminal investigations course at the university level for many years and addressed in that course the pre-interrogation legal requirements; the suspects alternatives; the definition of in-custody; why people confess; avoiding false confessions; the qualities of a good interrogator; recognizing deception during interrogations; and documenting interrogations.

I served as a member and Chairman of the North Carolina Criminal Justice Education and Training Council for three years and as a member and Vice-Chairman of the Florida Criminal Justice Standards and Training Commission for three years. In both capacities, I was part of a commission that was responsible for establishing uniform minimum standards for the employment and training of all full-time, part-time and auxiliary law enforcement officers and correctional officers in the respective states including the training of officers on conducting criminal investigations.

As a law enforcement expert, I have conducted analysis of several cases involving people who were convicted for crimes they did not commit and served many years in prison before it was determined by DNA testing that interrogation misconduct had resulted in false confessions being obtained. One of those cases involved Broward County Sheriff's Detective Anthony Fantigrassi, acting in concert with detectives from the City of Miami Police Department, to obtain a false confession from Jerry Frank Townsend, a mentally retarded individual, for several rape/murders that occurred in Broward County, Florida which resulted in his conviction and incarceration for more than twenty years for crimes he did not commit. A copy of my Expert Report in the Townsend case is attached as Appendix A to this report.

In addition to a book I co-authored titled *Prevention and Investigation of Officer Involved Deaths*; I have authored over thirty-five articles that have been published in legal, public administration and criminal justice professional journals.

I have qualified and testified as an expert in law enforcement matters in both state and federal courts over seventy times. My complete CV is attached as Appendix B to this report.

## OBJECTIVITY

Over the past eighteen years my trial and deposition testimony has been approximately 60% plaintiffs and 40% defendants. A list of my trial and deposition testimony for the past four years is attached as Appendix C to this report.

## FEES

My fee for the analysis in this case was $6,000.00. The flat fee was based upon a $150.00 hourly rate and an estimate that it would require approximately forty hours of work to review the materials provided and to prepare a report of opinions.

## ITEMS REVIEWED AND RELIED UPON IN DEVELOPMENT OF OPINIONS

Before developing my opinions in this case, I reviewed the materials listed in Appendix D attached to this report. The materials reviewed are of the type typically relied upon by consultants and experts when conducting an analysis of a police personnel matters and provided me with enough relevant data to develop my opinions to a reasonable degree of professional certainty.

## METHODOLOGY UTILIZED IN DEVELOPING OPINIONS

I reviewed the U.S. Supreme Court decisions *Daubert v. Merrill Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 147 119 S. Ct. 1167 (1999) which established the standards for scientific, non-scientific, technical and specialized knowledge expert witnesses and understand that a non-scientific expert must be qualified to offer expert testimony by knowledge, skill, experience, training, or education. I have provided in this report both my general and specific qualifications that I believe prove my qualifications to provide expert testimony in this case.

I understand that an expert's testimony must be relevant to the specific facts of an incident under consideration and be of such a specialized nature that it would be beyond the knowledge of a typical juror. I also understand that an expert's testimony must be of assistance to the jury in understanding the evidence and issues presented to them. I believe that my testimony regarding what law enforcement officers are taught in basic training programs about the concept of probable cause and the "balance sheet" process they should follow when making a probable cause determination; my testimony regarding what law enforcement officers are taught in basic training programs about what they should do when they learn of exculpatory evidence that would have a reasonable probability of altering the results in a criminal trial; my testimony regarding what law enforcement officers in basic training programs about their responsibility to advise any person of his/her Fifth Amendment rights before conducting a custodial interrogation; my testimony on what law enforcement officers were taught in criminal investigations training prior to 1983 about making audio recordings of interrogations in major cases; my testimony about what law enforcement officers are taught about conducting interrogations of juveniles; and my testimony on what law enforcement officers are taught to be alert for when conducting interrogations to avoid obtaining false confessions are all areas of testimony which would assist the jury in understanding the evidence presented to them and is testimony relevant to the facts of this case.

I understand that the methodology used and conclusions reached by the expert must also be reliable. To insure my methodology was reliable and my conclusions were based upon a reliable methodology, I did not assign credibility to any witness, reviewed sufficient data to reach conclusions to a reasonable degree of professional certainty, developed a set of material and relevant facts only after a review of all materials provided, and assumed those facts to be true solely for the purpose of analysis. I then analyzed those facts against a backdrop of the professional standards, the legal standards that those professional standards are based upon, and the practices, principles and protocols recognized, relied upon, and employed in the law enforcement profession on the date of this incident.

The methodology I have used in this case is the same that I have utilized for several years. The methodology has been accepted over seventy times by presiding judges in previous cases in which I have testified at trial. The methodology is consistent with the methodology utilized by other experts in the field of law enforcement when conducting an analysis of police procedures and practices.

## SUMMARY OF FACTS ASSUMED

The facts I assumed to be true for purposes of analysis in this case are outlined in Appendix E attached to this report. If asked to consider a different set of facts, I will analyze those facts and render opinions to the best of my ability.

## OPINIONS AND ANALYSIS

The basis and reasons for my opinions are premised upon my experience as a law enforcement officer, my education and training in law enforcement, my knowledge of law enforcement standards,

analysis and study in the field, through consulting professional literature, and the facts of this case as determined by a comprehensive review of the materials listed in Appendix D.

I presently hold the following opinions to a reasonable degree of professional certainty:

1.      The investigation into the murder of Ada Cox Jankowski conducted by Miramar Police Department investigators William Guess, George Pierson and William Mantesta, with the assistance of Broward County Sheriff's Office Deputy Anthony Fantigrassi, violated both the legal and criminal investigation standards recognized nationally in the law enforcement profession 1983. Their investigation could best be described as shoddy, incomplete, and biased. In addition, their reckless disregard of both the physical and testimony evidence in the case and of recognized legal and criminal investigation standards was directly and causally connected to the improper arrest, conviction and incarceration of Anthony Caravella for nearly twenty-six years for a crime which he did not commit.

## CRIMINAL INVESTIGATION STANDARDS

The primary objectives of a homicide investigation are: (1) to collect facts and information in an attempt to identify the individual, or individuals, responsible for the death; (2) to conduct a reasonably complete, objective, detailed and practical investigation; (3) to organize the facts and information in a way to provide for the presentation of the evidence in a manner sufficient to bring criminal charges; and (4) to provide any assistance required by the prosecutor's office during the criminal trial.

Since the first police officers were designated as detectives in the New York Police Department in 1857 a large body of knowledge has developed regarding the objectives and protocols for criminal investigations. Court decisions over the years have provided guidance to officers in many areas including, but not limited to, prohibiting officers from coercing suspects during interrogations to guarantee all confessions to crimes are freely and voluntarily given; requiring that suspects be advised of their right to legal counsel before answering any questions; requiring officers to develop a sufficient level of evidence (probable cause) before arresting a suspect; and requiring officers to divulge to the defense any information that might tend to clear a suspect of criminal wrongdoing.

5

In addition to those legal protocols, the law enforcement profession has developed protocols over the years, including but not limited to, the interrogations of juveniles; electronic recording of interrogations; the interrogation of mentally deficient individuals; and the methods for guarding against false confessions.

## VIOLATION OF PROTOCOLS ON INTERROGATION OF THE MENTALLY RETARDED

Training documents, published by law enforcement professional associations, have warned investigators for many years that mentally retarded persons may respond to questions in ways they believe the investigator wants them to respond and will often tell the investigator what they believe the investigator wants to hear with complete disregard for personal consequences.

Because mentally retarded individuals will often confess to crimes they did not commit, law enforcement officers have been taught in basic criminal investigations courses that they should guard against false confessions (admission of guilt in a crime in which the confessor is not responsible for the crime). They are also told in basic criminal investigations courses that many people will confess to crimes they did not commit just for attention (attention confessions), others will confess to crimes they did not commit to divert attention from the actual person who committed the crime (sacrifice confessions), and still others (mentally ill, mentally retarded, young people, juveniles) will confess as a result of their vulnerability to psychological interrogation techniques.

Law enforcement officers receiving training in criminal investigations courses are given examples of notorious false confessions going back to the one-hundred persons who falsely claimed to have abducted Charles Lindbergh's son in 1932 to more recent examples such as the 1989 Central Park, New York City jogger case in which five teenagers confessed, after psychological interrogation techniques were used, to attacking and raping a female jogger. The five teenagers spent thirteen years in prison before the real rapist was identified by DNA evidence in 2002; and, most recently, the confession of John Mark Karr to the murder of Jon Benét Ramsey for attention, when in fact he was not even in the State of Colorado when the crime was committed.

Law enforcement officers have also been instructed in basic criminal investigations courses that they should be careful not to inadvertently provide specific details about the crime to the suspect because that would "contaminate" a suspects confession and bring into question the trustworthiness of the confession.

Law enforcement officers are also taught in criminal investigation courses that a method of testing whether a confession given is trustworthy is to introduce to the suspect false information regarding the specific facts of the case and then see if the suspect changes his version of the facts to "fit" the false information provided him. Law enforcement officers are told in basic criminal investigations courses that they can identify possible false confessions by testing the trustworthiness of a confession through such a specific knowledge test.

6

Law enforcement officers are also taught in basic criminal investigations courses that a suspect who did not commit a crime will not possess personal knowledge of the crime details. They are also told in basic criminal investigations courses that withholding crime details from the public will provide the investigator with a means to test the validity of any confession to a crime through questioning on the specific details. They are told that (1) a confession is trustworthy if a suspect is able to recount specific details that were non-public (corroboration of known facts); (2) a confession is trustworthy if it leads them to information that they did not already know (the location of the murder weapon or other such evidence); or (3) a confession is trustworthy if the suspect's account of the crime "fits" with the objectively known facts of the crime (corroboration of known facts).

Because Anthony Caravella was obviously mentally retarded and therefore susceptible to making a false confession, Miramar Police Department Detectives Mantesta, Pierson and Guess should have tested any statement Caravella made against the evidence in the case.

At a hearing held on July 24, 1984 before Judge Arthur Franza, Circuit Court, 17th Judicial Circuit, there was testimony that a psychological evaluation was done on Anthony Caravella on October 4, 1983 and that evaluation placed Anthony in the mentally deficient range of intelligence with an I.Q. of 67 (pages 495-499 of transcript of Motion to Suppress Hearing).

When asked how he was able to answer questions about the murder of Ada Cox Jankowski if he wasn't there, Caravella answered that he only knew what the police told him (page 61 of Caravella deposition taken 3-19-12).

When asked at deposition why they picked up Anthony Caravella and took additional statements from him, Pierson responded that when they drove him around, he was able to provide them with new information (page 31 of Pierson deposition taken 6-8-12).

According to Anthony's mother, Anthony was susceptible to making a false confession and would confess to anything the Miramar Police wanted him to say. Further, Anthony had very low intelligence and had only gone through the seventh grade in school (Trial testimony of Anthony's mother page 1458@10-12 and page 1459 @ 3-9).

Anthony's friends in 1983 believed he was of below average intelligence (Dawn Herron deposition 39@9-15). One of his friends, Dawn Simone Herron reported that Anthony would often confess to crimes he didn't commit (Herron deposition 44 @ 14 and 45 @ 17).

Detective Guess knew Anthony was not normal and the psychological diagnostic report on Anthony Caravella done on 10-4-83 placed him in the mentally deficient range of intelligence (#5 Corrected Better Answers to City of Miramar's First Set of Interrogatories to Plaintiff).

Anthony Caravella was so mentally challenged that he had difficulty in understanding what evidence is and did not even know what an attorney was when he was given his Miranda Rights and

interrogated the first time in the Ada Cox Jankowski murder (pages 1 & 2 of Anthony Caravella statement to Miramar Detective G.H. Pierson on 12-29-83). Notwithstanding that obvious fact, Detectives Mantesta, Pierson, Guess and Fantigrassi interrogated him anyhow. Detective Pierson later even testified that Caravella understood perfectly what was being read to him (page 21, lines 14-15 of Pierson testimony at Motion to Suppress Proceedings held 7-23-84).

In this case, Anthony told the detectives in the first statement he gave that they took all of Jankowski's clothes off (page 26 of Caravella statement dated 12-29-83 in case # 83-11-291). However, that statement was inconsistent with the evidence in the case. By the time Caravella gave his fourth statement, he was saying that he left Jankowski's shirt on her because that was a statement needed by the detectives to" fit" the facts of the murder (page 43 of Caravella statement dated 1-4-84 in case # 83-11-291). Caravella also told the detectives he did not see anybody use any type of wire and didn't see any wire (page 31 of Caravella statement dated 12-29-83 in case # 83-11-291). However, that statement was inconsistent with the evidence in the case.

In this case, it was clear that Caravella was attempting to please the detectives in his statement when he even asked if he was "right" in the answer he was giving (page 34 of Caravella statement 12-29-83 in case # 83-11-291).

In this case, Anthony said he did not see a chair at the scene when the murder occurred (page 44 of Caravella statement 12-29-83 in case # 83-11-291), but when he gave another statement on 12-30-83 he stated there was a chair out there but the chair was not messed up in any way (pages 17-18 of Caravella statement dated 12-30-83 in case # 83-11-291). By the time Caravella gave his fourth statement to the detectives he was saying that he hit Jankowski with the chair (pages 36 and 37 of Caravella statement dated 1-4-84 in case # 83-11-291). His last statement was the only statement that "fit" the facts of the murder.

In this case, Miramar Detectives Mantesta, Guess and Pierson did not test Caravella's statements even though no blood, semen, fingerprints, hair, fiber or other physical evidence gathered in the Jankowski murder investigation pointed to Anthony Caravella (Pierson deposition 135@19).

Instead of conducting an objective investigation in an attempt to identify the killer, or killers, of Ada Cox Jankowski, the investigative practices followed by Miramar Detectives Guess, Mantesta and Pierson were the same that Broward County Deputy Anthony Fantigrassi followed in the Jerry Frank Townsend case.  In Townsend, Miami Detectives James Boone, Bruce Roberson, and Broward County Sheriff's Office Deputies Anthony Fantigrassi and Mark Schlein; (1) collected no physical evidence to tie Jerry Frank Townsend to any of the crimes he was accused of; and (2) claimed that Townsend provided them with information that only the killer would have known to support the confessions obtained from Townsend.

Any reasonable, properly trained and objective detective, investigating a homicide crime in 1983, would have known  that corroborating evidence needed to be obtained to insure against false confessions from mentally retarded individuals because retarded  people will often confess for attention, or to please the interrogator, even when not guilty of the commission of a crime.

Given what was learned by DNA testing, it is obvious that Detectives Pierson, Mantesta, Guess and Fantigrassi had to have improperly provided specific facts about the evidence in the Ada Cox Jankowski murder case which allowed Caravella to revise his version of events until it "fit" the physical evidence in the case so the investigators could corroborate his confession.

## VIOLATION OF ELECTRONIC RECORDING PROTOCOLS

By 1983, it had become well established and accepted in the law enforcement profession that detectives, when conducting interrogations in homicide cases or taking a suspect's confession to a homicide crime, should make an electronic recording and retain the recording as evidence that the detective afforded the person being interrogated with his constitutional rights and serve as evidence that any confession made was not coerced nor were facts unknown to the suspect provided to him to make a statement "fit" the facts of the crime under investigation for corroboration purposes. Electronic recording of interrogations in homicide cases over the years was deemed so important that many states passed laws requiring electronic recording of interrogations in all homicide cases.

The procedures recognized in 1983 were to (1) make a voice identification of the officers present, the name of the suspect, the names of any others present; (2) a voice identification of the date, time, and location of the interrogation or confession; (3) a statement of the time the recording began; (4) a statement of the time the interrogation began; (5) an administration of the Miranda warnings; (6) a statement from the suspect waiving his Miranda rights and agreement to make a statement; (7) a statement of the time and reasons for any lapses in the recording; (8) the date and time of the conclusion of the interrogation or confession.

In this case, there were four occasions when Anthony Caravella was advised of his rights and a tape recording made of the statements he gave "because Anthony was changing his statement somewhat and becoming –bringing himself into the case more and more" (Pierson deposition dated 5-14-84 page 26@23-25).

In this case, it was the fourth tape recorded statement that Anthony Caravella gave that was the "statement that Detective Pierson believed" (Pierson deposition dated 5-14-84 page 45 @ 14-17).

However, during the times Detectives Mantesta and Pierson drove Anthony Caravella around in a car and solicited information from him regarding the murder of Ada Cox Jankowski, a tape recording of their conversation was never made to insure they had not coerced him, or provided him with facts about the murder so his statements would "fit" the facts of the Jankowski murder case and corroborate any confession given (Pierson deposition, Volume II, 141@5-9).

As example, on December 30, 1983 Detectives Pierson and Guess drove Caravella around and talked to him about the Jankowski murder (pages 1 and 2 of Guess Supplementary Report dated 12-30-83) and on January 4, 1984 Detectives Pierson and Mantesta drove Anthony around the murder scene area for approximately two hours and did not make an audio recording to prove he was not coerced or provided with facts to "fit" the facts of the Jankowski murder (pages 41-46 of Mantesta deposition taken 7-16-84).

In addition. Broward County Sheriff's Office Sergeant Anthony Fantigrassi failed to make an electronic recording of his interrogation of Caravella on December 30, 1983 before he administered a polygraph exam to Caravella. Caravella was interrogated for four hours by Fantigrassi, outside the presence of his mother and without an attorney present, and the interrogation was not recorded electronically to have a record of proof that Fantigrassi did not provide Caravella with details of the murder so his later recorded statement would "fit" the crime (pages 8-10 and page 20 of Fantigrassi deposition taken 5-14-84; Fantigrassi trial testimony pages 1398, 1418 and 1421).

In addition. neither the note pack nor the polygraph chart was ever produced by Fantigrassi to the Miramar Police Department nor the Broward State Attorney's Office and they are not in existence today (Lamberti's Response to Request for Admissions dated May 4, 2012). The fact that neither the note pack nor the polygraph chart was ever produced calls into question whether they ever existed at all as Fantigrassi has provided testimony that the polygraph was used as a tool for interrogations and a true polygraph may not have always been done. As J. Graham stated in his Order in *Brown v. Singletary*. "Major Fantigrassi also attempted to discredit the polygraph, explaining that because it was set up as a ruse, it was not valid."

In addition, these interrogations of Caravella were conducted even though there had been placed a written invocation of Caravella's rights at 5:30 p.m. of December 29, 1983, specific to the Jankowski murder case, at the front desk of the juvenile detention center and copies of the invocation were provided to the Miramar Police Department. the Broward County Sheriff's Office and the State Attorney's Office (Siegal, Motion to Suppress, pages 510-12 and 514-16).

## AN INCOMPLETE. SHODDY. AND BIASED INVESTIGATION

During the investigation Miramar Detective George Pierson was contacted by Florida Marine Patrol Officer Charles Perrone and advised that he was at a nearby park and noticed an intoxicated man who appeared to have several spots of blood on his shirt. Pierson went to the park and located the individual who identified himself as Cyril Eustace Cozier. Cozier had an injury to his left thumb; there were several spots of blood on his shirt; and he had a small cut on his chin similar to that which might have been inflicted by a person's fingernail (Pierson Supplementary Report dated 11-5-83 in case # 83-11-291). However, Pierson did not photograph the scratch to preserve the evidence as any reasonable homicide detective would have done in 1983.

In this case, it was learned that Ada Cox Jankowski was last seen alive when she left a bar with a seventeen year old juvenile named Anthony Martinez (page 15 of Pierson Supplementary Report dated 11-5-83 in case 83-11-291; page 15 of Zinnie Miguez statement taken 11-7-83). When interviewed by Detective Pierson on 11-11-83, Martinez claimed he did not leave with Jankowski; when asked if he would take a polygraph examination he refused; and he appeared to be extremely nervous (page 27 of Pierson Supplementary Report dated 11-5-83 in case 83-11-291). On 11-15-83 when Martinez was contacted again about taking a polygraph exam and providing hair samples, his mother advised them that her son would not submit to a polygraph test or provide hair samples and she would be seeking legal counsel (page 32 of Pierson Supplementary Report dated 11-5-83 in case 83-11-291).

Anthony Martinez should have been considered the primary suspect in the murder of Ada Cox Jankowski because witnesses overheard him making plans with Jankowski to have sex with her (page 10 of Dorothy Martin statement dated 11-7-83); witnesses reported seeing Jankowski grabbing Martinez's penis (page 9 of Jorge Santiago statement taken 11-8-83); witnesses reported hearing Martinez and Jankowski planning a meeting behind the Publix store (page 3 of Barry Gibb statement taken 11-8-83);and witnesses reported Martinez left the Miramar Bar with Jankowski (page 15 of Pierson Supplementary Report dated 11-5-83 in case 83-11-291).

According to the bartender at the Miramar Lounge, Martinez was wearing jeans and a blue T shirt when he left the bar with Jankowski (page 13 of Dorothy Martin statement taken 11-5-83). A bar patron described the shirt Martinez was wearing as light colored and long sleeved (page 3 of Zinnie Miguez statement taken 11-7-83). However, when Martinez's mother gave the detectives the clothes she said her son was wearing the night of the murder; she gave them a dark blue shirt. According to Patrol Officer S. Deutel, they collected a pair of brown pants and a short sleeve navy blue shirt from Martinez's mother for analysis (Property Receipt-BSO Lab).

Any reasonable detective in 1983 would have questioned Anthony Martinez's mother as to why she was giving them a shirt that was not like the shirt witnesses described that Martinez was wearing the night of the murder.

In fact, because Martinez gave statements to the detectives which were inconsistent with the witnesses' statements (page 27 of Pierson Supplementary Report dated 11-5-83 in case # 83-11-291), and he had been seen leaving the bar with Jankowski, the detectives had probable cause to get a search warrant to search for the clothing he was wearing the night of the murder for analysis. However they did not do so. In addition, they did not attempt to get a search warrant for the examination of hair samples from Martinez even though they had probable cause to get a search warrant for the hair.

As it turned out, vaginal swabs from the body of Ada Cox Jankowski were later analyzed against the DNA of Anthony Martinez and Anthony Caravella and the DNA from Anthony Martinez could not be excluded (Bode Technology June 2, 2010 Report). However, Anthony Caravella's DNA was excluded as a possible contributor (Bode Technology Report March 24, 2010).

In this case, there was no blood, semen, fingerprints, hair, fiber or other physical evidence gathered in the Jankowski murder investigation which pointed to Anthony Caravella (Pierson deposition 135@19). Further, the detectives had to interrogate Caravella four times to get a statement from him that would fit the facts of the case suggesting they had to provide him with information to get the "fit" they were looking for. Their bias was so strong against Caravella that they claimed at trial that the hair evidence suggesting Cyril Cozier's involvement in the murder of Jankowski was the result of evidence contamination even though they had stated earlier that there was no possible way the evidence could have become contaminated (page 16, lines 7-17 of Pierson deposition taken May 14, 1984).

At trial in the Caravella case, Detective Pierson claimed that he had gone back to the crime scene and had touched the body of Jankowski as a means of explaining how the evidence from Jankowski's body could have gotten transferred to Cozier's shirt (testimony of Pierson at page 1726 and 1735 of Caravella trial transcript). However, when he was deposed in the matter on May 14, 1984, he testified that he had gone directly back to the police station with Cozier's shirt in the trunk of his car (Pierson testimony page 1736 of Caravella criminal trial transcript).

At trial in the Caravella case, Detective Mantesta claimed that he went to the evidence room at the Miramar Police Department with an Identification Technician and discovered several bags of evidence in the Jankowski murder case were torn and the seals had been partially opened (Mantesta testimony page 1175 of Caravella criminal trial transcript). Mantesta claimed that he reached inside one of the bags looking for the victim's clothing but discovered a pullover with some holes in it (Mantesta testimony page 1176 of Caravella criminal trial transcript). However, he never made a report of the possible contamination of the evidence (Mantesta testimony page 1184 of Caravella criminal trial transcript).

Further, although Detective Pierson said he sent hair samples from Ray Chappell to the Broward Sheriff's Office Lab and there is a property receipt indicating that occurred, no report of the results of that test exists (page 1705 of Pierson trial testimony; Miramar Police Department property Receipt dated 12-30-83 identified as Chappell hair sample).

The bias against Caravella in the Jankowski murder investigation was so strong that Broward Deputy Fantigrassi modified his polygraph examination results to make his results "fit" their narrative that Caravella was the murderer of Jankowski.

On December 30, 1983 Fantigrassi administered a polygraph exam to Caravella and reported to Caravella's mother that Anthony had admitted that he was the fourth person involved in the murder and rape of Jankowski. He reported to Detective Pierson that Caravella had passed the polygraph and was truthful when he implicated himself, Steve Chappell and two others. However, after Chappell was arrested and administered a polygraph exam on December 31, 1983 by Fantigrassi, Fantigrassi told Pierson that Chappell had no involvement in the Jankowski murder. He then claimed that he rechecked Caravella's polygraph examination and found that Caravella was deceptive when he said he did not have sex with Jankowski; was truthful when he admitted beating and stabbing Jankowski; and his results were inconclusive about others being involved with him. Fantigrassi also claimed that Caravella provided him with more details that only the killer would know (Caravella and Chappell polygraph reports; page 8 of Guess deposition testimony taken 7-16-84; page 31 of Mantesta deposition testimony; and page 36 of Pierson deposition testimony).

## PROPER LEGAL PROCEDURES

During the 1960's, the United States Supreme Court used the due process clause of the Fourteenth Amendment to extend the provisions of the Bill of Rights to criminal proceedings in the various States. The effect was to greatly reduce the use of questionable and improper tactics by the police

when conducting criminal investigations. The right to counsel, the necessity for probable cause, rules on search and seizure, interrogations, disclosure of exculpatory evidence to the defense, lineups, and the collection and preservation of evidence were promulgated by our courts and became part of the criminal investigations training programs in police agencies throughout the United States.

## VIOLATED PROTOCOL PROHIBITING COERCION

Law Enforcement officers have been instructed in basic training programs for many years that confessions to crimes not freely and voluntarily given will not be admissible as evidence. Notwithstanding that training, Miramar Detectives Pierson and Mantesta used physical force against Anthony Caravella to improperly coerce a confession from him that he had murdered Ada Cox Jankowski.

Detectives Pierson and Mantesta went to the home of Dawn Herron (Simone) on December 28, 1983 to purportedly talk with Anthony Caravella about a bicycle theft. According to Herron (Simone), when the detectives came there they discovered Anthony Caravella in the garage and after the detectives went into the garage she heard a lot of banging and noise and Anthony yelling (Herron Deposition dated 5-31-12 page 59 @ 19-23 and 60 @ 1).

According to Donna Simone, Dawn Simone's mother, the police came to her door and asked to speak with Anthony. They located Anthony in the garage and were upset with him. According to Donna Simone, they took one of her phone books into the garage and hit Anthony with it. She said she didn't see them hit Anthony, but she could here it and he looked roughed up when they took him off to jail (statement of Donna Simone to Al Smith, Public Defender Investigator on October 5, 2005).

According to Herron (Simone), after they got to the police department and were separated she could hear a lot more banging and a lot of yelling (Page 14, line 19-20 of Herron statement dated 9-3-09).

According to Robin Siegel, Assistant Public Defender, Broward County, Florida, she was appointed to represent Anthony Caravella in a juvenile matter and learned that he had been picked up by the Miramar Police Department on December 29, 1983. She went to the Miramar Police Department on the morning of December 30, 1983 and met with Anthony who was in a holding cell. When she saw Anthony, "his lips were all blue and they were cut. He was holding a tissue up to them and bleeding" (Robin Siegel testimony at Hearing on Motion to Suppress, page 505 lines 6-8).

## NO PROBABLE CAUSE TO ARREST

Law Enforcement officers have been instructed in basic training programs for many years that no warrants shall be issued and no arrest shall be made unless the officer has developed facts that causes him to reasonably believe the person he is going to arrest has committed a criminal offense.

Probable cause (that level of proof that would cause an officer to reasonably believe that a crime had been committed and the person or persons he had identified had committed the crime) has been described in law enforcement training materials as a "balance sheet process."

This "balance sheet process" simply means that, as an officer conducts a preliminary investigation, he accumulates information that either supports probable cause (incriminating information) or undermines probable cause (exculpatory information). The officer then makes a decision as to whether or not probable cause exists by balancing the incriminating facts against the exculpatory facts. (International Association of Chiefs of Police Training Key #136 entitled *Probable Cause* attached as Appendix F).

In this case, the body of Ada Cox Jankowski was found on the morning of November 5, 1983 on the grounds of the Miramar Elementary School. She had been brutally raped and murdered.

While at the murder scene, Miramar Detective George Pierson was contacted by Florida Marine Patrol Officer Charles Perrone and advised that he was at a nearby park and noticed an intoxicated man who appeared to have several spots of blood on his shirt. Pierson went to the park and located the individual who identified himself as Cyril Eustace Cozier. Cozier had an injury to his left thumb, there were several spots of blood on his shirt and he had a small cut on his chin similar to that which might have been inflicted by a person's fingernail. Detective Pierson also noted a large amount of hair on the front of Cozier's shirt and asked if it would be ok to take a sample of the hair. Cozier told him to take the entire shirt and turned it over to Pierson (pages 2 and 3 of Pierson Supplementary Report dated 11-5-83 in case 83-11-291). Pierson placed Cozier's shirt into an evidence bag and took it to the police station.

On 11-5-83 Detective Pierson pulled all the hairs off Cozier's shirt and placed the hairs in an envelope and sealed it. No other evidence from the Jankowski murder was in the room when he pulled the hairs from the shirt and placed them into an envelope and sealed it (pages 14, 15 &16 of Pierson deposition taken May 14, 1984).

On 11-5-83 Detective Pierson placed Cozier's shirt in a separate bag, sealed it and marked it. No other evidence from the Jankowski murder was in the room when he placed the shirt into a separate evidence bag and sealed it (pages 14, 15 &16 of Pierson deposition taken May 14, 1984).

On 11-8-83, all evidence obtained from the crime scene, the medical examiner's office (hair samples from victim's head and pubic area) and the Cozier evidence was submitted to the Broward County Sheriff's Office Laboratory for analysis, and from there, the sealed envelopes containing hairs and fibers were sent directly to the FBI (page 5 of Pierson Supplementary Report dated 11-5-83 in case 83-11-291).

Anthony Caravella was excluded as the donor of any hair taken from the body of Jankowski. However, there was physical evidence to tie Cyril Cozier to the Jankowski murder.

14

In the investigation into the murder of Ada Cox Jankowski, there was never any blood, semen, fingerprints, hair, fiber or other physical evidence gathered which pointed to Anthony Caravella (Pierson deposition 135@19).

In this case, it was learned that Ada Cox Jankowski was last seen alive when she left a bar with a seventeen year old juvenile named Anthony Martinez (page 15 of Pierson Supplementary Report dated 11-5-83 in case 83-11-291). When interviewed by Detective Pierson on 11-11-83, Martinez claimed he did not leave with Jankowski, when asked if he would take a polygraph examination he refused and appeared to be extremely nervous (page 27 of Pierson Supplementary Report dated 11-5-83 in case 83-11-291). On 11-15-83 when Martinez was contacted again about taking a polygraph exam and providing hair samples, his mother advised them that her son would not submit to a polygraph test or provide hair samples and she would be seeking legal counsel (page 32 of Pierson Supplementary Report dated 11-5-83 in case # 83-11-291).

In this case, Anthony Caravella, who had previously acted as an informant for detectives of the Miramar Police Department (Pierson deposition dated 5-14-84 page 8 @ 12-21), was contacted on November 16, 1983 by Detective Pierson to see if he could be helpful in their investigation into the homicide of Ada Cox Jankowski which occurred on November 5, 1983 (Page 33, Pierson Supplemental Report in Case # 83-11-291 Ada Cox Jankowski homicide).

Later, because Pierson claimed someone had seen Caravella early on November 5, 1983 standing by a fence in the area where the body of Ada Cox Jankowski was found (page 2 of Pierson Supplemental Report dated 12-30-83), the investigators decided to pickup Caravella on an active Juvenile Pickup Order and interrogate him about the Ada Jankowski murder.

On December 29, 1983, at approximately 1:00 am, Caravella was advised of his Miranda rights in the presence of his mother and he agreed to waive his rights and speak to the detectives about the Ada Cox Jankowski murder. In that statement, Caravella identified three persons who he claimed were the murderers and denied any personal involvement. When questioned about the details of the crime he claimed to have witnessed, Caravella was unable to provide a physical description of Jankowski; stated he did not see any type of chair in the area (even though a broken chair was found at the scene and had blood on it and had been used as a weapon on Jankowski); stated that he didn't observe the victim being choked; and was unable to provide any description of the clothing Jankowski was wearing (Pages 5 & 6 of Pierson Supplementary Report in Case # 83-11-291).

At approximately 11:30 am on December 30, 1983, Caravella was transported to the Broward County, Florida Sheriff's Office for a polygraph examination. Prior to the polygraph examination, Broward County Sergeant Anthony Fantigrassi claims that Caravella told him that he had not told the complete truth in his previous statement to the detectives and that he was personally involved in the homicide and sexual battery of Jankowski (Pages 9 & 10 of Pierson Supplementary Report in Case No. 83-11-291). However, Sergeant Fantigrassi did not make an electronic recording of that interrogation as evidence that he neither coerced Caravella, nor provided him with details about the murder of Jankowski so as to elicit testimony that would "fit" the facts of the case (Testimony of Sergeant Fantigrassi, page 1,404 of trial transcript in *State v. Anthony Caravella*).

During the polygraph examination, Fantigrassi claims that Caravella stated that Ray Steven Chappell was also involved in the murder and rape of Jankowski and Sergeant Fantigrassi reported that Caravella had successfully passed the polygraph examination (Page 10 of Pierson Supplementary Report in Case No. 83-11-291).

At approximately 10:15 pm on December 30, 1983, Ray Steven Chappell agreed to meet with the Miramar detectives at the Miramar Police Department. Once at the Miramar Police Department Chappell was advised of his rights; waived his rights and was questioned about the Jankowski murder. Although Chappell denied any involvement in the murder of Jankowski and voluntarily provided hair samples from his head, he was charged with First Degree Murder based upon the probable cause obtained from the statement of Caravella (Page 11 of Pierson Supplementary Report in Case No. 83-11-291).

At approximately 4:00 am on December 31, 1983, Chappell was administered a polygraph examination by Broward County Sheriff's Office Sergeant Fantigrassi. Fantigrassi reported that, in his opinion, Chappell had no involvement in the murder of Jankowski. Fantigrassi then reported to the detectives that, he reviewed the results of the polygraph examination of Caravella and determined that, in fact, Caravella had shown deception when he implicated Chappell in the murder of Jankowski. Chappell was immediately "unarrested." However, neither the note pack nor the polygraph chart was ever produced by Fantigrassi to the Miramar Police Department nor the Broward State Attorney's Office and they are not in existence today (Lamberti's Response to Request for Admissions dated May 4, 2012).

On January 30, 1984, the hair and fiber evidence, originally sent to the Broward County Sheriff's Crime Lab and from there to the FBI Crime Lab, were returned and showed that head and pubic hairs from the victim, Ada Cox Jankowski, were found on the shirt of Cyril Cozier (Plaintiff's Exhibit # 127 in 11-61607-cv; Pierson Supplementary Report 1-3-84; Mantesta Supplementary Report 1-31-84 and Podolak trial testimony pages 1763-1768).

On February 15, 1984 another submission of head and pubic hair samples from Cyril Cozier and Anthony Caravella were sent to the FBI Crime Lab for analysis. The results of those tests showed that Anthony Caravella was excluded as a potential donor of any of the hairs taken from Ada Cox Jankowski's clothing (trial testimony of FBI Agent Andrew Podolak, page 1776, line 13). However, Cozier's head hair was found on Ada Cox Jankowski's clothing (trial testimony of FBI Agent Andrew Podolak, page 1777, lines 4-8).

In addition, it should have been obvious to the Miramar detectives that Caravella was mentally retarded. Caravella also gave several conflicting statements regarding the Jankowski murder and was unable to provide the detectives with any information to corroborate his confessions until provided, either inadvertently or on purpose, with information to "fit" the facts of the case.

Detective Pierson was even aware that Caravella had a tendency to provide false information as Caravella had reported to him that he found Jankowski's purse when in fact the purse was found by Felicia Morgan's sister (page 42 of Pierson Supplementary Report dated 11-5-83 in case # 83-11-291).

Had the judicial officer who authorized an arrest warrant for Caravella been informed that (1) Caravella had to be interrogated four times before he could give a statement that "fit" the facts of the case; and (2) he was a juvenile with a limited mental capacity and less than a seventh grade education; and (3) the results of the hairs and fiber examination in the Jankowski murder case excluded Caravella and incriminated Cyril Cozier; and (4) that Anthony Martinez was seen leaving the bar with Jankowski before her body was found and he gave statements when interviewed that were inconsistent with statements given by witnesses at the bar; and (5) witnesses reported that Jankowski and Martinez were talking about having sex before they were seen leaving the bar together (page 10 of Dorothy Martin statement dated 11-7-83), the judicial officer would have concluded probable cause did not exist to arrest Anthony Caravella for the murder of Ada Cox Jankowski.

The failure of the detectives to advise the judicial officer of the information that was clearly exculpatory for Anthony Caravella was a breach of their duty to act in good faith and to conduct an unbiased investigation.

### VIOLATION OF *MIRANDA V. ARIZONA*

Officers have been told in criminal investigations training programs since the 1966 U.S. Supreme Court decision *Miranda v. Arizona*, 384. U.S. 436 that they are required to clearly inform any suspect being interrogated that (1) they have a right to remain silent; (2) anything they say may be used against them in a court of law; (3) they have a right to consult with an attorney and have the attorney present during questioning; and (4) if they can't afford an attorney, one will be appointed to represent them.

These rights are typically printed on a department approved standardized form, which the investigator has the suspect sign as proof that he was advised of his rights. The signed form is then kept as a permanent record in the investigative file to protect the officer from charges of coercion.

Any reasonable, properly trained and objective detective, investigating a homicide crime in 1983 would have known that the protocol accepted in the law enforcement profession in 1983 was to Mirandize any person considered a suspect in a crime and to obtain a waiver prior to conducting any interrogation.

At approximately 11:00 pm on December 28, 1983 Anthony Caravella was picked up and transported to the Miramar Police Department by Officer John Petrone and turned over to Detective Pierson and Mantesta (page 2 of Pierson Supplemental Report dated 12-30-83).

According to Detective Pierson, Caravella was "not actually a suspect" in the Jankowski murder at that point (Pierson deposition dated 5-14-84 page 21@4), however, he "just thought he would go in there and ask him what he was doing over there near the crime scene that early in the morning" (Pierson deposition dated 5-14-84 page 21 @ 21-23 and Mantesta deposition dated 7-16-84 page 5). He then "asked him what he was doing there" and "if he knew anything about the homicide" (Pierson deposition dated 5-14-84 page 22 @5-19).

In reality, Anthony Caravella was a suspect in the Ada Cox Jankowski murder and had been listed as such in a report filed by Detective Pierson dated 11-25-83 (Miramar Police Department Juvenile Report in case # 83-11-291).  However, he was questioned for two hours and not advised of his rights under *Miranda* before being asked questions about the murder and the interrogation was not electronically recorded (page 2 Pierson Supplementary Report dated 12-30-83 in Case No. 83-11-291).

Even before the tape recorded interrogation of Anthony Caravella occurred, Detective Mantesta contacted the on-duty prosecutor, Robert Berube, and asked him if Anthony gave a confession could they charge him with First Degree Murder. According to Mantesta, Prosecutor Berube explained to them that even if a juvenile waived his rights and gave a confession, it would be better to not charge him until the information he gave could be substantiated (page 1 Mantesta Supplementary Report dated 12-30-83 in case 83-11-291).

Because the interaction on December 28, 1983, between Miramar Police Detective Pierson and juvenile (15 years old) Anthony Caravella was a custodial interrogation into the homicide death of Ada Cox Jankowski, Detective Pierson violated recognized police homicide interrogation standards recognized in Florida in 1983 when he failed to obtain the permission of Caravella's mother before starting the interrogation; when he failed to make an electronic record of the interrogation; and when he failed to advise Caravella of his rights guaranteed by the U.S. Supreme Court before he asked him any questions at all about the murder of Ada Cox Jankowski.

In this case, Detective Pierson's own reports acknowledges that Anthony Caravella was questioned about the Ada Cox Jankowski murder before being advised of his Miranda Rights (page 2 Pierson Supplementary Report dated 12-30-83 in Case No. 83-11-291). According to Pierson, Anthony Caravella was in the custody of Miramar detectives for more than two (2) hours and asked questions about the Ada Cox Jankowski murder before his mother was contacted and arrived at the Miramar Police Department and before Caravella was advised of his rights (Page 2 Pierson Supplementary Report in Case No. 83-11-291).

Later, according to Detective Pierson, Anthony Caravella made a statement after being advised of his rights with his mother present.  In that recorded statement, he implicated others in the Jankowski

murder, but not himself, so they decided to have him administered a polygraph by Sergeant Fantigrassi of the Broward Sheriff's Office (Pierson deposition 5-14-84 page 33 @ 22-25 and page 34 @16-20).

On December 30, 1983 Broward County Sheriff's Office Sergeant Anthony Fantigrassi interrogated Caravella regarding the Jankowski murder but failed to make an electronic recording of his interrogation of Caravella before he administered a polygraph examination (Fantigrassi trial testimony in *State v. Caravella* page 1,405@ 21-25 and page 1,404 @ 7) and did not advise him of his Miranda rights before he interrogated him for four hours before administering the polygraph exam.

His failure to advise Caravella of his Miranda Rights also violated the Broward Sheriff's Office District Criminal Investigations Manual in effect in 1983 (page 16, section 4.1 E of C1 Manual).

## VIOLATIONS OF *BRADY V. MARYLAND*

In 1963, the U.S. Supreme Court held in the case of *Brady v. Maryland*, 373 U.S. 83,87 (1963) that the prosecution in a criminal trial has a duty to disclose to the defense and material that is exculpatory of the defendant.

Although the *Brady* case referred only to the duty of the prosecution to disclose evidence falling under the rule, subsequent cases that flowed from *Brady* clearly established the requirement that law enforcement officers are required to inform the prosecution of any evidence known to them that could meet the rule (International Association of Chiefs of Police National Law Enforcement Policy Center Concepts and Issues Paper titled Brady Disclosure Requirements attached as Appendix G).

During the prosecution of Anthony Caravella for the murder of Ada Cox Jankowski, Miramar Detectives Mantesta, Pierson and Guess failed to fulfill their duty to disclose evidence they had gathered in the Ada Cox Jankowski murder investigation that would have been exculpatory for Anthony Caravella.

In this case, one of the first investigative leads assigned to Detective George Pierson in the Ada Cox Jankowski murder investigation was to talk with Cyril Cozier, an individual noticed by a Marine Patrol Officer near the scene of the Jankowski murder on the morning the body was discovered with blood and hair on his shirt (Pierson deposition 22@21-25). When Cozier gave Pierson the shirt he just "took the shirt off." Pierson didn't remember if he "handed to him inside out or if he pulled it straight off his back and handed to him" (Pierson deposition 112@14-16). He immediately placed the shirt in a bag and placed the bag in the trunk of his car (Pierson deposition 112@23-24). Pierson took hair samples from Cozier's shirt to be analyzed and placed it in an evidence locker on November 4, 1983 at 5:00 p.m. (Pierson deposition 60@1-8). A later analysis by the FBI lab found Cozier's head hairs on Ada Cox Jankowski's clothing. However, instead of considering the hair

evidence as evidence tending to clear Anthony Caravella, which they would have to divulge to the defense under *Brady*, Detective Pierson claimed there "was contamination of the physical evidence in the Jankowski murder case at the FBI Lab" (Pierson deposition dated 5-14-84 page 48 @21-5 and page 49 @ 1-4).

Further, on October 28, 2002, an Assistant State Attorney discovered an audio tape of a recorded phone conversation made on January 17, 1984 in which Jorge Delgado admitted to Miramar Police Detective Mantesta that he was involved in the Jankowski murder. That recording had not been disclosed to the lawyer defending Caravella at his criminal trial as required under the *Brady* Rule (tape recording of January 17, 1984 telephone call from Jorge Delgado to Detective Mantesta).

Because DNA testing in the Jankowski murder case specifically excluded Anthony Caravella as the murderer (Plaintiff's Exhibit #135 to Detective Joseph Tomlin deposition and deposition testimony of Detective Joseph Tomlin 10@1-4); and an earlier FBI examination of hairs excluded Caravella as a suspect; and there was <u>no</u> physical or testimony evidence to tie Caravella to the murder of Jankowski, it is obvious that Miramar Detectives George Pierson, William Mantesta and William Guess, along with Broward County Sheriff's Office Sergeant Anthony Fantigrassi had to have provided Anthony Caravella with information about the Ada Cox Jankowski murder so he could give them feedback of information that would "fit" the facts of the case and serve as corroboration of his confession.

2.      A pattern and practice of biased investigations: improper use of force; *Brady* violations; false arrest; and ignoring misconduct existed in the Miramar Police Department in 1983 and continues to be the custom and practice today.

In addition to the information provided above on the use of force to coerce a confession from Caravella; the lack of probable cause to arrest Caravella for the murder of Ada Cox Jankowski; and the *Brady* violations (pages 12-18 of this report), the claim made by the Miramar detectives at the trial of Anthony Caravella that the hair evidence (clearing Anthony Caravella and incriminating Cyril Cozier) in the Ada Cox Jankowski murder investigation somehow got contaminated even though the FBI was never informed that there was a possible contamination of the evidence (trial testimony of FBI Agent Andrew Podolak, page 1778, line 17) and Detective Pierson had earlier been adamant that the evidence had not been contaminated (page 16, lines 7-17 of Pierson deposition taken May 14, 1984), suggests that a custom and practice of violating the rights of suspects in homicide investigations was the common practice in the Miramar Police Department in 1983.

In addition, the fact that it was not disclosed to the defense as required under *Brady* that a audio tape of a recorded phone conversation was made on January 17, 1984 in which Jorge Delgado admitted to Miramar Police Detective Mantesta that he was involved in the Jankowski murder suggests that a custom and practice of violating the rights of suspects in homicide investigations was the common practice in the Miramar Police Department in 1983 (tape recording of January 17, 1984 telephone call from Jorge Delgado to Detective Mantesta).

In addition, even though hair from the body of Ada Cox Jankowski was found on the shirt of Cyril Cozier and Miramar Detective Marc Ganow was aware of that (Ganow deposition 36 @ 4), it appears that Detective Ganow just blindly accepted the theory that the result from the FBI Lab was because of contamination of the evidence as Ganow did not do any investigation further into the possible role of Cyril Cozier in the case (Ganow deposition 72 @ 14). This suggest that a custom and practice of violating the rights of suspects in homicide investigations at the Miramar Police Department continues today.

Further evidence that a custom and practice of violating the rights of suspects in homicide investigations continues today at the Miramar Police Department can be inferred by the fact that the Miramar Police Department has not requested that the hair found under the fingernails of Ada Cox Jankowski be DNA tested against Cyril Cozier. According to Detective Joseph Tomlin, who took over the re-investigation of the Ada Cox Jankowski murder case in the summer of 2010 from Detective Ganow, he never even looked at Cozier as a suspect in the case because Cozier had been eliminated in the earlier investigation (Tomlin deposition page 23 @ 20-24).

The Miramar Police Department is aware of the fact that DNA analysis from the vaginal swab of Jankowski did not exclude Anthony Martinez, however, hairs and other material under Jankowski's fingernails did not match up with DNA from Martinez. Therefore, it is reasonable to assume that more than one person was involved in the murder of Jankowski.

Given that the hair found on Cyril Cozier's shirt could have come from Jankowski, any reasonable detective today would have DNA analysis done of the hairs to determine if Cozier was also involved. Their failure to do so suggests a continuation of the custom and practice of biased and incomplete investigations.

In addition, the on-going investigation by the Miramar Police Department into what happened in the Ada Cox Jankowski murder investigation appears to be attempting to prove that Caravella was involved in the murder even though DNA evidence specifically excluded Caravella (Bode Technology 11-23-09 Report identified as Exhibit 136). This effort suggest that a custom and practice of violating the rights of suspects in homicide investigations continues today.

Finally, a review of Miramar Internal Affairs files shows a continuing pattern and practice of incompetent investigations by the Miramar Police Department. For example, Detective Ganow attempted to close other crimes during his interrogation of Shawn Prince without corroboration (pages 23-24 of Shawn Prince statement taken 9-26-02).

3.     A pattern and practice of biased investigations; false arrest; and ignoring misconduct existed in the Broward County Sheriff's Office in 1983 and subsequent years.

In 1983, the Broward County Sheriff's Office had in effect a written policy for multiple case clearances, based upon a system for exceptional clearance of multiple cases without prosecution, by obtaining confessions for crimes, including rapes and homicides, without any evidence to

corroborate the confession. This process allowed detectives to clear numerous cases at one time by accepting confessions from a suspect without the need for any corroboration of the confession and to "hide" the lack of any corroboration by only filing a multiple case clearance report on cases that were exceptionally cleared and not on any case where an arrest was made. That process prevented the cases that were exceptionally cleared by uncorroborated confessions from ever coming to the attention of a defense attorney (pages 46, 47, and 48 of the Broward Sheriff's Office District Criminal Investigations Manual identified as Plaintiff's Exhibit D in Chief John Palmer deposition taken in Townsend case). Unfortunately, that process also encouraged investigators to obtain confessions and not to worry about corroboration.

In the Jankowski murder investigation, at approximately 11:30 am on December 30, 1983, Caravella was transported to the Broward County, Florida Sheriff's Office for a polygraph examination.

Broward County Sergeant Anthony Fantigrassi claims that, prior to the polygraph examination, Caravella told him that he had not told the complete truth in his previous statement to the detectives and that he was personally involved in the homicide and sexual battery of Jankowski (Pages 9 & 10 of Pierson Supplementary Report in Case No. 83-11-291). However, Sergeant Fantigrassi did not make an electronic recording of that interrogation as evidence that he neither coerced Caravella, nor provided him with details about the murder of Jankowski so as to elicit testimony that would "fit" the facts of the case (Testimony of Sergeant Fantigrassi, page 1,404 of trial transcript in *State v. Anthony Caravella*).

During the polygraph examination, Fantigrassi claims that Caravella stated that Ray Steven Chappell was also involved in the murder and rape of Jankowski and Sergeant Fantigrassi reported that Caravella had successfully passed the polygraph examination (Page 10 of Pierson Supplementary Report in Case No. 83-11-291).

At approximately 10:15 pm on December 30, 1983, Ray Steven Chappell agreed to meet with the Miramar detectives at the Miramar Police Department. Once at the Miramar Police Department Chappell was advised of his rights; waived his rights and was questioned about the Jankowski murder. Although Chappell denied any involvement in the murder of Jankowski and voluntarily provided hair samples from his head, he was charged with First Degree Murder based upon the probable cause obtained from the statement of Caravella (Page 11 of Pierson Supplementary Report in Case No. 83-11-291).

At approximately 4:00 am on December 31, 1983, Chappell was administered a polygraph examination by Broward County Sheriff's Office Sergeant Fantigrassi. Fantigrassi reported that, in his opinion, Chappell had no involvement in the murder of Jankowski. Fantigrassi then reported to the Miramar detectives that he reviewed the results of the polygraph examination of Caravella and determined that, in fact, Caravella had shown deception when he implicated Chappell in the murder of Jankowski. Chappell was immediately "unarrested." However, neither the note pack nor the polygraph chart was ever produced by Fantigrassi to the Miramar Police Department nor the Broward State Attorney's Office and they are not in existence today (Lamberti's Response to Request for Admissions dated May 4, 2012).

The failure of Fantigrassi to retain any notes about what Caravella supposedly said to him prior to the polygraph exam, along with his failure to make an electronic recording of that interrogation, or to retain the polygraph printouts, to provide evidence that Caravella was not provided with information to insure his statement would "fit" the facts of the Jankowski murder is consistent with Fantigrassi's actions in the Jerry Frank Townsend case.

In the Jerry Frank Townsend case, Fort Lauderdale Police Department Detective John Curcio compared the taped confessions of Townsend to the crime scene evidence in several murders and decided to re-open the Moore and Marion cases that the Fort Lauderdale Police Department had closed as a result of Townsend's confessions. The re-opening of the investigations resulted in an analysis of DNA evidence which conclusively eliminated Jerry Frank Townsend as the murderer.

Because confessions from Townsend in those cases were used against him as collateral evidence in other cases, the State Attorney, Seventeenth Judicial Circuit for Broward County, Florida filed a Motion to Vacate Townsend's convictions.

On April 30, 2001, May 2, 2001, and May 14, 2001, the criminal courts in Broward County entered orders vacating Townsend's convictions for the murders of Terry Cummings, Naomi Gamble, Barbara Brown and Cathy Moore. On June 15, 2001, the criminal court in Miami-Dade vacated Townsend's convictions for the murders of Wanda Virga and Dorothy Gibson and the sexual battery of Pilbyian Beckford.

Any objective and reasonable person, aware of the findings of Detective John Curcio and the fact the criminal courts vacated all of the murder convictions against Townsend, would have to conclude that Miami Detectives James Boone and Bruce Roberson, in concert with Broward County Deputy Sheriff's Anthony Fantigrassi and Mark Schlein, coached Townsend with information and detailed facts and provided him with information to assist him in making confessions while knowing that his confessions were false.

Notwithstanding the fact that the confessions of Townsend were found to have been "false," former Broward County Sheriff Jenne, and subsequent Broward County Sheriffs, ignored the misconduct; allowed Fantigrassi to remain in criminal investigations; allowed Fantigrassi to be in charge of the evidence function; failed to evaluate the investigative practices employed by Fantigrassi; and, instead, encouraged Fantigrassi's misconduct by promoting him.

Respectfully Submitted,

*Mel L. Tucker*

Melvin L. Tucker
October 5, 2012

23